**UNITED STATES of America,
Appellee,**

v.

**Cornell Francis EVANS, Appellant.**

**No. 99–3068.**

United States Court of Appeals,
District of Columbia Circuit.

Argued April 20, 2000.

Decided June 27, 2000.

Neil H. Jaffee, Assistant Federal Public Defender, argued the cause for appellant. With him on the briefs were A. J. Kramer, Federal Public Defender, and Jennifer M. Blunt, Assistant Federal Public Defender. Evelina J. Norwinski, Assistant Federal Public Defender, entered an appearance.

Elizabeth H. Danello, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, and John R. Fisher, Assistant U.S. Attorney.

Before: RANDOLPH, TATEL, and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

The defendant in this case, Cornell Evans, was convicted of multiple felonies relating to the possession and distribution of illegal narcotics. The principal issue on appeal concerns the testimony of an FBI agent who stated at trial that the government "had received information" that defendant was involved in drug trafficking. Defendant contends that this testimony was hearsay and that its admission was

erroneous. Defendant is correct. We conclude, however, that the error was harmless, and therefore affirm his convictions.

## I

This case arose out of an undercover narcotics operation conducted by the Federal Bureau of Investigation. In the fall of 1996, special agents of the FBI met with Thomas "Tee" Rose, a former District of Columbia resident who was serving a federal prison sentence at the Fairton Correctional Institution and who had two additional state cases pending against him. The agents agreed to help Rose with his sentence and pending charges in return for his assistance in the investigation of other crimes. Thomas Rose told the agents that defendant Evans was involved in drug trafficking, and he referred them to his uncle, George Rose of Pennsylvania, who agreed to assist the FBI provided that his incarcerated nephew would receive the benefit of his cooperation.

George Rose contacted the defendant by telephone in early March 1997. In that and subsequent conversations, all taped by the FBI, Rose arranged to purchase crack cocaine from Evans at a barber shop where Evans worked. The subject of drugs first arose when Rose complained that "[t]he quality of stuff" in Pittsburgh was "terrible." Evans then said: "I got a few people I can talk to ... depending on what you want." Defendant noted that the "going price was forty-five for an eighth" but that there was a shortage, so prices were rising. He agreed to look into current prices, and in a series of further calls the two worked out the details of the transaction. On March 18, 1997, Rose met Evans outside the barber shop and gave him $1,800 in cash for 62 grams of crack. The purchase was captured on tape by a body recorder worn by Rose and on film by FBI surveillance cameras.

Ten days later, George Rose telephoned Evans and the two discussed another drug transaction. On April 1, 1997, Rose again met Evans at the barber shop, where he purchased approximately 124 grams of cocaine powder for $3,600. As before, Rose wore a body recorder that taped the transaction. Rose tried to arrange a third transaction on April 23, but Evans said that his drug supply had dried up.

The FBI arrested Evans more than a year later, on October 13, 1998. In a search incident to the arrest, agents discovered four small bags of cocaine powder rolled up in Evans' pants leg. After waiving his *Miranda* rights, defendant admitted the March 18, 1997 transaction but claimed not to remember the subsequent deal on April 1. He told the agents that "Tee" had called him from jail and asked him to "show around" his uncle, George Rose. He said that George Rose had then contacted him and expressed an interest in obtaining cocaine, and that he had agreed to help Rose out. According to Evans, someone in the barbershop whom he did not know had given him the names of two people who could supply him with cocaine. Evans then contacted those people, whose names he also did not remember. The suppliers brought the drugs to Evans at the shop, where he delivered them to Rose. Evans said that he had provided the drugs "as a favor to Tee and George Rose." 2/4/99 a.m. Tr. at 80.

Evans was charged with unlawful use of a communications facility, distribution of cocaine and cocaine base, and possession of cocaine. The case went to trial on February 4, 1999, and defendant was convicted on all counts.

## II

On appeal, Evans raises four challenges to his convictions and sentence. Of these, only one merits considerable attention: Evans' claim that the district court committed reversible error by admitting certain government testimony into evidence. We address that contention first, beginning with a recitation of the relevant facts.

## A

The government's first witness at trial was FBI Special Agent Neil Darnell. After Darnell testified about the origins of the undercover operation, including the FBI's contact with Thomas Rose and George Rose's agreement to cooperate, the prosecutor asked the agent how he "came about knowing Mr. Evans." 2/4/99 a.m. Tr. at 26. Defense counsel objected on the ground that the question necessarily called for hearsay as to what Thomas Rose had told the FBI. The defense emphasized that Rose was not a witness and would not be available for cross-examination. In response, the prosecutor argued that the evidence was not hearsay because it was only offered "to establish where the FBI met with George Rose and why they did what they did with George Rose." *Id.* The district court overruled the objection.

The prosecutor resumed his questioning by asking Darnell why he had specifically discussed Evans with George Rose. Agent Darnell answered: "We had received Mr.—or information that Mr. Evans was involved in drug trafficking and—." *Id.* at 27. Defense counsel interrupted with an objection, which was again overruled. Agent Darnell then added: "And Mr. Rose was in a position to directly go in and approach Mr. Evans about narcotics." *Id.* The prosecutor then asked whether the FBI's "information" had come from Thomas Rose, and Darnell answered that it had. The court sustained an objection to this question and answer, and directed the jury to disregard the latter.

Shortly thereafter, the defense requested a bench conference and moved for a mistrial based on the admission of Darnell's hearsay testimony that the FBI "had received information" that Evans was involved in drug trafficking. Counsel argued that the jury could infer that Thomas Rose was the one who had identified Evans as a drug dealer, that this made it appear more likely that Evans had committed the charged acts, and that Evans would be unable to cross-examine his accuser "because this guy is not going to be here to testify." *Id.* at 39–40. Again, the government argued that it had elicited the testimony not to prove the truth of the matter asserted, but rather "to prove why the FBI did what they did." *Id.* at 40. The court denied the mistrial motion without prejudice to its being renewed later in the proceedings. At the end of the government's case-in-chief, defense counsel renewed the motion, and the court made the same ruling.

Evans' defense consisted of the testimony of three witnesses, each of whom said they had never seen any indication that defendant distributed drugs, as well as Evans' testimony on his own behalf. On the witness stand, Evans admitted to his participation in the two charged drug transactions. He testified that Thomas Rose had told him that his uncle, George Rose, was coming to D.C. and had asked him to show George around. Evans said he had not expected George to ask him to supply drugs, but that he had been able to obtain some for him from sources whose names he did not remember. Evans maintained that the two transactions with George Rose were the only times he had ever distributed drugs, and specifically denied that he had ever sold drugs with Thomas Rose. He further stated that he had agreed to participate in the two sales because he and Thomas Rose "had a good friendship." 2/5/99 Tr. at 112; *see also id.* at 124.

The defense renewed its motion for a mistrial two more times—after it rested and at the close of all the evidence. In one colloquy, the court acknowledged that it "might have been a mistake to overrule the objection" to Darnell's testimony, but allowed the testimony to stand. 2/4/99 a.m. Tr. at 41.

In closing argument, defense counsel conceded Evans' participation in the two drug transactions. He argued, however, that defendant had been unlawfully entrapped into participating. Although the

district court gave instructions regarding the entrapment defense, the jury returned a guilty verdict on every count.

## B

■ Defendant contends that Agent Darnell's testimony that the FBI "had received ... information that Mr. Evans was involved in drug trafficking" was inadmissible hearsay—that is, "a statement, other than one made by the declarant while testifying at the trial ..., offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801 (defining hearsay); *see* FED.R.EVID. 802 (making hearsay inadmissible). We review this allegation under the abuse of discretion standard. *See United States v. Clarke*, 24 F.3d 257, 267 (D.C.Cir.1994).

■ The problem with hearsay is that it deprives the defendant of the opportunity to cross-examine the person who uttered the statement at issue. Here, the government presented allegations of prior drug dealing, and the defendant was unable to cross-examine the person who made them. At the time of the testimony, that person—the less-than-reputable convict, Thomas Rose—was sitting in a federal correctional institution. Meanwhile in court, telling Rose's story, was the clean-cut FBI agent, Neil Darnell. Thus, Evans had no opportunity to "test[ ] the recollection and sift[ ] the conscience" of his accuser, nor could he compel him "to stand face to face with the jury in order that they [might] look at him, and judge by his demeanor upon the stand and the manner in which he [gave] his testimony whether he [was] worthy of belief." *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970) (quoting *Mattox v. United States*, 156 U.S. 237, 242–43, 15 S.Ct. 337, 39 L.Ed. 409 (1895)). Cross-examination may be the "greatest legal engine ever invented for the discovery of truth," *Green*, 399 U.S. at 158, 90 S.Ct. 1930, but it is not of much use if there is no one to whom it can be applied.

The government contends that Darnell's statements did not constitute hearsay because they were not "offered in evidence to prove the truth of the matter asserted." FED.R.EVID. 801(c). That is, they were not offered to prove that Evans actually had been involved in drug trafficking. But if Darnell's testimony about the FBI's "information" did not go to the truth of that assertion, to what did it go? The trial prosecutor said he offered the testimony to establish "why they did what they did with George Rose." For testimony to be admissible for any purpose, however, it must be relevant. *See* FED.R.EVID. 402. And to be relevant, it must have a "tendency to make the existence of [a] fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." FED.R.EVID. 401. How was "why they did what they did with George Rose" related to such a fact of consequence? Three possible, interconnected explanations can be inferred from the government's appellate brief and oral argument. We consider each in turn.

First, the government suggests that the testimony was relevant to show that Evans had not been improperly targeted or selectively prosecuted—that is, it was offered to show the state of mind of the FBI agents, rather than the truth of the allegations upon which their state of mind was based. While selective prosecution may qualify as an issue of consequence in some proceedings, *see generally United States v. Washington*, 705 F.2d 489, 494–95 (D.C.Cir. 1983), it was not an issue in Evans' trial. Defendant did not raise such an allegation through argument or testimony, nor did he "open the door" to the matter through inferences made during cross-examination. *See United States v. Forrester*, 60 F.3d 52, 60–61 (2d Cir.1995); *United States v. Reyes*, 18 F.3d 65, 69–70 (2d Cir.1994). Indeed, the hearsay at issue here was elicited during the direct examination of the government's first witness, before Evans had presented a case or even begun to cross-examine. Moreover, when Evans

eventually did put on a defense, it was not selective prosecution but entrapment. Hence, why the agents did what they did— i.e., the agents' motives for investigating Evans—never became a fact of consequence to the determination of the action.

Approving the admission of Agent Darnell's testimony under these circumstances would open a large loophole in the hearsay rule. If we were to accept the government's rationale here, then explaining why government agents "did what they did" through reference to statements of absent informants would be acceptable in almost any case involving an undercover operation, and in many others as well. That is a loophole this circuit has previously refused to open.

In *United States v. Hilliard*, a case involving an armed robbery, government witnesses effectively told the jury that "as a result of information ... obtained by the police," the defendant's picture had been included in the photographic array shown to the victim. 569 F.2d 143, 146 (D.C.Cir. 1977). The defendant objected on the ground that this suggested that information outside the record proved his guilt. This court agreed, concluding that the prosecutor had violated the hearsay rule by "insinuat[ing] that information obtained from unknown witnesses identified the robber as [the defendant]." *Id.* at 144. There, as here, the government argued that the testimony was not hearsay because it had not been offered for its truth. Rather, the government said, it had been "offered merely to explain why the police took the action they did in placing [the defendant's] picture in a photographic array." *Id.* at 146. Speaking for the court, Judge Robb responded:

> We reject this argument. There was no issue as to the presence of [the defen-

dant's] picture in the array, and therefore no occasion for any explanation. In any event, explanation of a photographic array cannot be allowed to repeal the hearsay rule.

*Id.*; *see United States v. Freeman*, 514 F.2d 1314, 1317 (D.C.Cir.1975) (reversing conviction because, inter alia, police testimony recounting witness tip was hearsay and inadmissible to explain why police went to defendant's house), *vacated on other grounds*, 598 F.2d 306 (D.C.Cir. 1979).[1] The same response is warranted in this case.

■■■ The government's second relevance argument is that Agent Darnell's testimony was necessary to combat the threat of "jury nullification." We are not certain what the government means by this contention. If this is just another way of saying that the government did not want the jury to think it had engaged in selective prosecution, we have already addressed the point above. It appears, however, that the government may mean something more: that the testimony was necessary to ensure that the jury did not miss the context of the events and the moral significance of the allegations, and thus render an unjustified acquittal. It is true, of course, that as a general matter the prosecution is entitled to present the "whole story" of criminal misconduct in order to guard against just such an eventuality. *See Old Chief v. United States*, 519 U.S. 172, 186–89, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997); *United States v. Crowder*, 141 F.3d 1202, 1207 (D.C.Cir. 1998) (en banc). But in presenting that story, the government is as much bound by the rules of evidence as it is on any other issue. No matter how important it is for the government to present a complete, morally compelling narrative, it must pres-

---

1. *See also United States v. Lovelace*, 123 F.3d 650, 652–53 (7th Cir.1997) (finding admission of informant's tip unnecessary to correct impression of racial bias because bias was not at issue in case); *Forrester*, 60 F.3d at 59–61 (reversing conviction where informant evidence was admitted to show officer's state of mind, which was not "relevant to the determination of any material fact"); *United States v. Johnson*, 439 F.2d 885, 888–89 (5th Cir.1971) ("The desire of the government to show the jury why its agents were on the lookout for Johnson can in no way justify the use of prejudicial hearsay.").

ent that narrative through admissible evidence, not through hearsay.

Finally, the government contends that the evidence of "why they did what they did" was relevant as "background"—merely for the value of giving the jury a complete picture of the events in question. Sometimes courts excuse the use of hearsay evidence for background purposes where the evidence is on an uncontroverted matter, where hearsay is the most efficient means of transmitting it, and where there is little chance of prejudice to the defendant. *See generally United States v. Gatling*, 96 F.3d 1511, 1523–24 (D.C.Cir. 1996) (concluding that trial court's error in permitting witnesses to testify about prior statements by nonparty witnesses was "at most harmless" and served to "provide background"). But where those conditions are not met—as they are not here—the government must prove "background" the same way it would any other set of relevant facts.

The government correctly notes that when the "background" being offered is the state of mind of the police, it is technically not hearsay at all. *See Gatling*, 96 F.3d at 1524. Nonetheless, to be admissible it must still be relevant, and if "background" was related to a fact "of consequence to the determination" of this case,

it was only barely so. Even the government concedes that the probative value of Agent Darnell's statement as background was "not significant." Br. for Appellee at 15.

■ At this point we must consider the role of Rule 403, compliance with which we again review under the abuse of discretion standard. *See United States v. Davis*, 181 F.3d 147, 151 (D.C.Cir.1999). Under that Rule, evidence is excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." FED.R.EVID. 403. Regardless of the reason for which the court and the prosecutor thought the evidence was being offered, the prejudice inquiry asks whether "the jury [was] likely to consider the statement for the truth of what was stated with significant resultant prejudice." *Reyes*, 18 F.3d at 70. In this case, the answer is yes: There was considerable danger that the jury would consider the information about Evans' prior drug crimes for its truth, and hence as evidence of his propensity to commit the crimes with which he was charged.[2] When that danger is weighed against the insignificant probative value of the testimony as background, the Rule 403 balance comes out clearly against admission.[3]

---

2. Such consideration would be improper not only under Rules 801 and 802, but also under Rule 404(b). The latter states that "[e]vidence of other crimes ... is not admissible to prove the character of a person in order to show action in conformity therewith." FED. R.EVID. 404(b); *see Old Chief*, 519 U.S. at 181–82, 117 S.Ct. 644.

3. *See Lovelace*, 123 F.3d at 653 (holding that admission of informant's tip that defendant would have drugs at specified location violated Rule 403, notwithstanding that it was offered to explain basis for police action); *Reyes*, 18 F.3d at 72 (reversing conviction where "resulting prejudice from the receipt of ... incriminating [out-of-court] declarations was considerable and far exceeded the minimal or non-existent probative value of the [declarations'] non-hearsay uses" as background evidence); *United States v. Alonzo*, 991 F.2d 1422, 1426–27 (8th Cir.1993) (hold-

ing that if a statement "is both permissible background and highly prejudicial, otherwise inadmissible hearsay, fairness demands that the government find a way to get the background into evidence without the hearsay"); *United States v. Mancillas*, 580 F.2d 1301, 1310 (7th Cir.1978) (holding that although giving "the jury a sense of the context of the activities to be described may provide some incidental benefit ...[,] any such value ordinarily is substantially outweighed by the danger of unfair prejudice"); 2 McCORMICK ON EVIDENCE § 249 (5th ed.1999) ("[Officers] should not ... be allowed to relate historical aspects of the case, such as ... reports of others containing inadmissible hearsay. Such statements are sometimes erroneously admitted under the argument that the officers are entitled to give the information upon which they acted. The need for this evidence is slight, and the likelihood of misuse great."); *cf. Gatling*, 96 F.3d at 1524 (upholding con-

Moreover, the use of that testimony to establish propensity was not the only danger in this case. As the trial judge properly instructed the jury, one element of the entrapment defense is a lack of predisposition on the part of the defendant to commit the crime. *See United States v. Glover*, 153 F.3d 749, 754 (D.C.Cir.1998). Agent Darnell's statement could not permissibly have been used to establish predisposition, since the issue of predisposition goes to Evans' state of mind (why *he* did what he did with George Rose), not to that of the agents (why *they* did what they did with him). *See United States v. Webster*, 649 F.2d 346, 349–50 (5th Cir.1981) (en banc). There was considerable risk, however, that the jury would use the agent's testimony in that impermissible way. Indeed, the prosecutor explicitly sought to use Darnell's testimony to establish Evans' predisposition in his closing argument. *See* 2/5/99 p.m. Tr. at 18–19. Although the court correctly barred the government from making that argument, it did not caution the jury against drawing the connection on its own. In failing to do so, the court may have committed error under Rules 801 and 802 by permitting the jury to use the testimony for its truth. *See* Fed.R.Evid. 801, 802.[4] In any event,

without a limiting instruction, the risk that Evans would be unfairly prejudiced by the jury's use of the testimony for its truth substantially outweighed the testimony's minimal value as background. *See Webster*, 649 F.2d at 351; *United States v. Catanzaro*, 407 F.2d 998, 1000–01 (3d Cir. 1969) (reversing conviction where jury may have used hearsay statement as evidence of defendant's predisposition).

■ The danger of unfair prejudice was further compounded by the instruction that *was* given to the jury. The entrapment instruction informed the jury that "willingness to commit the crimes may be shown in many ways, including by evidence of the defendant's prior similar conduct." 2/5/99 p.m. Tr. at 37. Since Agent Darnell's testimony that the FBI "had received ... information that Mr. Evans was involved" in prior drug trafficking was certainly "evidence of the defendant's prior similar conduct," the jury could reasonably have concluded that this was the evidence to which the judge was referring.[5] Thus, the jury was effectively instructed that it could use the agent's testimony for its truth, in violation of Rules 801 and 802.[6] This, of course, also greatly increased the risk that the jury would actually use the testimony for that impermissible purpose,

viction where "any error that the court made" in admitting out-of-court statements for background purposes was harmlessly cumulative); *Clarke*, 24 F.3d at 267 (affirming where admission of police background testimony, although "questionable," was harmlessly cumulative); *United States v. Freeman*, 816 F.2d 558, 563–64 (10th Cir.1987) (finding no error where admission of informant's statements for background purposes was nonprejudicial).

**4.** *Cf. Reyes*, 18 F.3d at 69 (holding that even where there have been limiting instructions, "when the likelihood is sufficiently high that the jury will not follow the limiting instructions, but will treat the evidence as proof of the truth of the declaration, the evidence is functionally indistinguishable from hearsay").

**5.** Darnell's testimony was not the evidence the court actually had in mind when giving the instruction. *See* 2/5/99 p.m. Tr. at 20 (advising counsel that instruction "pertains to

the defendant's admission with respect to the exportation of drugs and not testimony from Agent Darnell"). The instruction, however, did not specify which prior conduct it encompassed.

**6.** Under Rule 404(b), evidence of prior crimes is admissible to prove the defendant's state of mind, and therefore his predisposition. *See* Fed.R.Evid 404(b); *United States v. Burkley*, 591 F.2d 903, 921 (D.C.Cir.1978). Like other facts, however, the prior crimes must themselves be proven through admissible (nonhearsay) evidence. *See Webster*, 649 F.2d at 349–50. As noted in the text, Agent Darnell's testimony could not have been used to prove that the prior crimes occurred (the truth of the matter asserted), and hence had no relevance to the question of defendant Evans' state of mind (predisposition). The most for which Darnell's testimony could have been used would have been to establish *his* state of mind—a fact not relevant to the state of mind of the defendant. *See id.*

further compounding the error committed under Rule 403.

In sum, we conclude that the admission of Special Agent Darnell's testimony was error under the Federal Rules of Evidence: under Rules 801 and 802 because the jury was effectively told that the testimony could be used for its truth, and under Rule 403 because the probative value of the only relevant nonhearsay purpose—general background—was substantially outweighed by the danger of unfair prejudice.

**C**

■ In addition to constituting error under the Federal Rules, the admission of Agent Darnell's testimony may have violated Evans' rights under the Confrontation Clause. *See* U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him....").  The purpose of that clause is to "ensure the reliability of the evidence against a criminal defendant by subjecting it to rigorous testing in the context of an adversary proceeding before the trier of fact." *Lilly v. Virginia*, 527 U.S. 116, 123–24, 119 S.Ct. 1887, 144 L.Ed.2d 117 (1999) (internal quotation omitted).  As we have already noted, such testing is not possible where, as here, the government presents the testimony of an out-of-court declarant through the mouth of another witness. *See id.* at 124, 119 S.Ct. 1887 (citing *California v. Green*, 399 U.S. 149, 158, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970)).

■ Nonetheless, not every use of hearsay violates the Confrontation Clause. "[W]here proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay rule, the Confrontation Clause is satisfied." *White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992); *see also Lilly*, 527 U.S. at 124–25, 119 S.Ct. 1887; *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).  In this case,

the government has not suggested any hearsay exception that might apply to Darnell's testimony.  Instead, it contends that Darnell's testimony was not hearsay at all because it was not offered to prove the truth of the matter asserted.  If that contention were correct, there would be no violation of Evans' confrontation rights. *See Tennessee v. Street*, 471 U.S. 409, 414, 105 S.Ct. 2078, 85 L.Ed.2d 425 (1985) (holding that the nonhearsay aspect of a confession, not offered to prove its truth, "raises no Confrontation Clause concerns").  As noted above, however, the jury was effectively told that it could use the evidence as proof of defendant's predisposition—i.e., for its truth.  That erroneous instruction, coupled with the admission of Darnell's testimony, may well have deprived Evans of his right to confront his true accuser—Thomas Rose. *See id.* (noting that had jury been asked to infer that defendant's confession proved his participation in the crime, the evidence would have been hearsay and Confrontation Clause concerns would have been implicated); *United States v. Jordan*, 810 F.2d 262, 264 (D.C.Cir.1987).

**D**

■ We need not resolve whether the error at issue in this case violated only the Rules of Evidence, or whether it also ran afoul of the Confrontation Clause.  Because an error clearly occurred, the dispositive question is whether it was harmless.  If it was, it cannot result in the reversal of Evans' convictions regardless of how we classify it. *See* FED.R.CRIM.P. 52; *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

■ It is true that the distinction between constitutional and nonconstitutional error can be quite important, since the standards for testing whether such errors are harmless are different. *See O'Neal v. McAninch*, 513 U.S. 432, 438, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995); *Brecht v. Abrahamson*, 507 U.S. 619, 622–23, 637–38,

.113 S.Ct. 1710, 123 L.Ed.2d 353 (1993). The standard for determining whether a constitutional error is harmless is whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); *see Neder v. United States,* 527 U.S. 1, 119 S.Ct. 1827, 1837, 144 L.Ed.2d 35 (1999). For nonconstitutional errors, the standard is whether the error did not have "substantial and injurious effect or influence in determining the jury's verdict." *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946); *see Brecht,* 507 U.S. at 637, 113 S.Ct. 1710.

▮▮▮▮ In the instant case, however, the difference between the standards does not matter because the error was harmless under both. Although the jury could have used the hearsay testimony to conclude that defendant had a propensity to commit the charged drug offenses, Evans conceded that he committed those offenses, thereby removing the question of propensity from the case. Rather than contest that he sold drugs to George Rose, Evans claimed he was entrapped. The entrapment defense comprises two elements: "government inducement of the crime, and a lack of predisposition on the part of the defendant to engage in the criminal conduct." *Mathews v. United States,* 485 U.S. 58, 63, 108 S.Ct. 883, 99 L.Ed.2d 54 (1988); *see Glover,* 153 F.3d at 754. While the admission of Agent Darnell's testimony could have been prejudicial with respect to predisposition, the jury does not consider predisposition unless the defendant has first satisfied the burden of showing government inducement. *See Glover,* 153 F.3d at 754 ("[T]he defendant bears the initial burden of showing government inducement; if he is successful, the burden then shifts to the government to prove the defendant was predisposed to commit the crime."); *United States v. Whoie,* 925 F.2d 1481, 1485 (D.C.Cir.1991). Evans' jury was instructed accordingly. *See* 2/5/99

p.m. Tr. at 37. Hence, the key question is whether the defendant presented sufficient evidence of inducement.

At oral argument, Evans' counsel conceded that the evidence of inducement was "slight." We see none at all. "Even when a government agent repeatedly requests that the defendant engage in criminal conduct, inducement is not established unless the requests are coupled with persuasive overtures." *United States v. McKinley,* 70 F.3d 1307, 1312 (D.C.Cir.1995). The only "persuasive overture" proffered by defense counsel was Evans' claim that he provided the drugs because he and Thomas Rose "had a good friendship." Although we have in the past indicated that "pleas based on ... friendship" can satisfy the inducement prong of an entrapment defense, we have never found such a plea sufficiently strong to do so. *United States v. Layeni,* 90 F.3d 514, 517 (D.C.Cir.1996); *see, e.g., Glover,* 153 F.3d at 755; *McKinley,* 70 F.3d at 1314.

But here there was no *plea* to friendship at all. According to Evans' own account, his friend, Thomas Rose, "never mentioned" drugs to him. 2/5/99 a.m. Tr. at 124. Rather, he "just asked me to look out for [his uncle], show him around the city." *Id.* at 123. Evans does not contend that this constituted an implied request to provide George Rose with drugs. To the contrary, defendant testified that he had not expected his friend's uncle to bring up the subject. *See id.* at 111. Hence, even accepting defendant's version of the facts, it establishes only that he independently decided to provide the drugs out of friendship for George Rose's nephew—not because of any plea from that nephew. This is insufficient to raise a jury question as to inducement, and because the jury was correctly instructed that inducement is a prerequisite for entrapment, defendant's entrapment defense necessarily failed for want of proof. *See McKinley,* 70 F.3d at 1309. Indeed, under these circumstances, defendant was not entitled to an entrapment instruction in the first place. *See*

*Glover,* 153 F.3d at 755; *McKinley,* 70 F.3d at 1309. Because entrapment was Evans' only defense (given his concession to having participated in the charged drug transactions), we can say with certainty that the erroneous admission of Agent Darnell's testimony did not contribute to the result in this case.

### III

■ The other issues raised on appeal require only brief discussion. In his opening brief, Evans' principal claim was that the trial judge committed reversible error by denying his request to strike a potential juror for cause. Evans ultimately used a peremptory challenge to strike the juror, who was not seated. After the opening brief was filed, the Supreme Court decided *United States v. Martinez–Salazar,* which held that a defendant cannot assert error after using a peremptory challenge to remove a juror who he alleges should have been excused for cause. *See* —— U.S. ——, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000). Evans concedes that *Martinez–Salazar* resolves this claim.

■ Second, Evans contends that he should have received the benefit of the "safety valve" provisions of the federal sentencing guidelines, which would have allowed him to obtain a sentence below the statutory minimum of 120 months. *See* U.S.S.G. § 5C1.2; *see also* 18 U.S.C. § 3553(f); 21 U.S.C. § 841(b). For a defendant to receive the benefit of the safety valve, the trial court must find, inter alia, that "the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct." U.S.S.G. § 5C1.2(5). The court declined to make that finding, and there is more than sufficient evidence in the record to support the court's decision. *Compare, e.g.,* 5/14/99 Tr. at 10 (defense's contention that Evans did not know the names of the two men who supplied the drugs for the charged transactions), *with id.* at 33 (court's conclusion

that taped conversations showed Evans knew "fully what the nature and source of supply was … and whom he has been dealing with and whom he has done other transactions with").

■ Finally, Evans argues that he should have received a downward departure from the applicable guideline range due to extraordinary family circumstances. Our review of a denial of a downward departure is limited. *See In re Sealed Case,* 199 F.3d 488, 490 (D.C.Cir.1999); *United States v. Leandre,* 132 F.3d 796, 800 (D.C.Cir.1998). Although Evans contends that the district court erroneously thought itself without authority to depart, the record reveals that the court knew it had the authority but that it concluded a departure was unwarranted after examining the relevant circuit precedents. *See* 5/14/99 Tr. at 33–34. We again concur with the district court and find no error in its decision. *See Leandre,* 132 F.3d 796; *United States v. Dyce,* 91 F.3d 1462 (D.C.Cir.1996).

### IV

In closing, we take this opportunity to make a suggestion similar to one made by the Second Circuit in analogous circumstances. *See United States v. Reyes,* 18 F.3d 65, 72 (2d Cir.1994). The analysis that has led us to conclude that the agent's testimony was improperly admitted is complicated, and we are well aware that trial courts do not have the opportunity we do to explore such intricacies at length. In this case, as in many, the issue arose without warning in the form of an objection to a question that the examiner had already posed. If the trial was not to be disrupted, the court had to resolve the issue on the spot without benefit of research. Yet, had the error not been harmless, its prejudicial impact would have required reversal of Evans' convictions.

■ When the government wishes to offer incriminating evidence of uncertain admissibility, these kinds of risks can be

obviated through the submission of a motion in limine (written or oral) prior to the offer and before the jury is seated for the session at which the offer is to be made. In some situations, such advance notice is required by the Federal Rules. *See* FED. R.EVID. 404(b).[7] Even where it is not, this procedure would advance the government's dual interests in ensuring that defendants are accorded justice at trial, while protecting the integrity of verdicts on appeal.

In the case of Cornell Evans, although we find that error occurred, we also find that the error was harmless. Accordingly, defendant's convictions and sentence are affirmed.

7. Rule 404(b) provides that, with respect to evidence of "other crimes, wrongs, or acts," upon request by the accused, the prosecution in a criminal case shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.
FED.R.EVID. 404(b). Although there may have been a Rule 404(b) violation here, defendant has not alleged one.