*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

**DISTRICT OF COLUMBIA COURT OF APPEALS**

No. 24-CM-0606

ALONZO HINTON, APPELLANT,

v.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2024-CMD-001899)

(Hon. Robert R. Rigsby, Trial Judge)

(Submitted September 30, 2025    Decided February 19, 2026)

*Sweta Patel* was on the brief for appellant.

*Edward R. Martin, Jr.*, United States Attorney at the time the brief was filed, and *Chrisellen R. Kolb*, *Benjamin Kurland*, and *Megan Abrameit*, Assistant United States Attorneys, were on the brief for appellee.

Before BECKWITH, MCLEESE, and DEAHL, *Associate Judges*.

BECKWITH, *Associate Judge*: Alonzo Hinton was convicted after a bench trial of unlawful entry[1] for refusing to leave Z-Mart, a convenience store, when directed

---

[1] D.C. Code § 22-3302(a)(1).

to do so by a Metropolitan Police Department (MPD) officer at the behest of a store clerk. Mr. Hinton was arrested under unusual circumstances: an individual[2] had recently been found dead in the back room of the store, and Mr. Hinton was frustrated that the MPD officers who responded to the scene had not shut down the store to customers.

Under the District of Columbia's unlawful entry statute, in a prosecution for refusal to quit private property, the government must prove beyond a reasonable doubt that an individual with lawful authority over the property asked the defendant to leave that property and that the defendant refused. *Glosser v. United States*, 318 A.3d 510, 516 (D.C. 2024). On appeal, Mr. Hinton argues that his conviction was invalid for three reasons. First, the trial court erred in admitting a hearsay statement by a Z-Mart store clerk. Second, even if that statement were admissible, the government still failed to prove an individual with lawful authority asked Mr. Hinton to exit. Third, the government failed to prove that Mr. Hinton refused to leave the store.

We are unpersuaded by Mr. Hinton's arguments and affirm his conviction.

_____

[2] At trial, defense counsel described the deceased individual as Mr. Hinton's friend.

## I. Background

Sergeant Antony Coleman—one of two MPD officers who responded to the scene after a Z-Mart employee discovered an unconscious individual in the store's back room—was the only witness to testify at trial. According to Sergeant Coleman, prior to this incident he had been to Z-Mart "multiple times" while on the job and accordingly was familiar with the store and "some of" its employees. On the day in question, he and Officer Grant Thomas discovered that the unconscious man in the back room was deceased, so they began an investigation but allowed the store to remain open for business. Mr. Hinton approached the back room and asked why the store was still open. In response, Sergeant Coleman shut the door to the back room.

Some moments later, "Mr. Mohammad"[3]—whom Sergeant Coleman identified as a Z-Mart store clerk he had encountered "multiple times"—asked Sergeant Coleman, "Can you help me with that guy out there, he keeps bothering us so much, man. I give him two times barring notices."[4] Body-worn camera (BWC)

---

[3] The spelling of "Mohammad" is based on the trial court reporter's phonetic transcription because his name was not spelled in court. Mr. Mohammad's first name is not in the record.

[4] Later, Sergeant Coleman learned that the "original barring notice that [he] was given was not for Mr. Hinton." As to the second barring notice, Sergeant Coleman testified that he "could not conclude if it was for [Mr. Hinton] because there was no body worn camera footage." Because this is a failure-to-quit

footage from both Sergeant Coleman and Officer Thomas shows that the two walked to the front of the store and approached Mr. Hinton.[5] Sergeant Coleman then told Mr. Hinton that he had a barring notice and asked Mr. Hinton to leave the store. When Mr. Hinton stayed where he was and asked why the officers allowed the store to remain open even though there was a dead body in the back of the store, Sergeant Coleman told Mr. Hinton several times to either "walk out or you're going to jail." At one point, Mr. Hinton started to walk toward the exit of the store, but he stopped and the interaction continued. After about ninety seconds of back-and-forth between the two men, Sergeant Coleman used force to arrest Mr. Hinton.[6]

At trial, Mr. Hinton moved for a judgment of acquittal, arguing that the government failed to produce Mr. Mohammad as a witness, meaning that it also failed to prove that an individual with authority to exclude had requested that Sergeant Coleman remove Mr. Hinton and that because this "was a 90 second interaction," the government could not meet its high burden. After rejecting that motion, the trial court stated that it "had an opportunity to review all the evidence"

---

prosecution and not a prosecution predicated on failure to comply with a barring notice, the validity of the notices is immaterial to the theory of the case.

[5] Although not entirely clear from the testimony or BWC footage, there was no dispute at trial that the man Mr. Mohammad asked Sergeant Coleman to remove from the store was Mr. Hinton.

[6] The arrest led to a use-of-force investigation, which according to Sergeant Coleman was for "tracking purposes only."

and "credit[ed] the testimony" of Sergeant Coleman before finding Mr. Hinton guilty of unlawful entry.

## II. Lawful Authority

Mr. Hinton first argues that the trial court erred in admitting Mr. Mohammad's statement to Sergeant Coleman over defense objection because it was inadmissible hearsay. He further argues that even if that statement were admissible, the government still failed to present sufficient evidence to meet its burden on that element.

## A. Hearsay

Our review of the admission of statements purported to be hearsay is generally for abuse of discretion. *Grimes v. United States*, 252 A.3d 901, 914 (D.C. 2021). "To the extent the application of a particular hearsay exception turns on a finding of fact, 'we review the finding for clear error,'" but "'whether the trial court adhere[d] to the [appropriate] test for the admission of hearsay' under any given exception 'is a legal question' that we effectively review de novo." *Id.* at 914 (quoting *Mayhand v. United States*, 127 A.3d 1198, 1205 (D.C. 2015)). The parties here agree that the question whether a statement is hearsay is subject to de novo review.

Hearsay is an out-of-court assertion of fact offered in court to prove the truth of the matter asserted therein. *(Damion) Jones v. United States*, 17 A.3d 628, 632 (D.C. 2011). Where a statement is *not* being offered to prove its truth, it is not hearsay and it is admissible barring another evidentiary barrier. *See id.*; *Burgess v. United States*, 786 A.2d 561, 570 (D.C. 2001) (where a statement is nonhearsay, it is not an abuse of discretion to admit it). Here, Mr. Hinton argues that the trial court erred when it admitted, over objection, Mr. Mohammad's statement to Sergeant Coleman to help him "with that guy out there, he is bothering us so much, man. I give him two barring notices, and he keeps coming back." At trial, the first time the statement came up was during Sergeant Coleman's testimony—but at that point, it was spoken only by the prosecutor because the trial court instructed Sergeant Coleman to limit his testimony to what "he did in response to whatever this was." [7]

The government argues that the statement was not hearsay because it was not introduced for the truth of the matter—rather, it was introduced to show the effect

---

[7] Specifically, the prosecutor proffered that the statement was "something along the lines of, that guy out there, he is bothering us so much, man. I give him two barring notices, and he keeps coming back." Owing to the trial court's instruction, Sergeant Coleman simply testified that "[i]n response to what the employee told me, I approached the defendant and informed him that he would have to leave the store . . . ." The statement came up again when the portion of Sergeant Coleman's BWC was played in which Mr. Mohammad uttered the statement. Defense counsel renewed his objection.

the statement had on Sergeant Coleman. Specifically, the statement from Mr. Mohammad was the reason Sergeant Coleman sought to exclude Mr. Hinton from the premises. *See Darab v. United States*, 623 A.2d 127, 135 & n.22 (D.C. 1993) (under our refusal-to-quit statute, an individual may act through a police officer in ordering someone to exit). At trial, the prosecutor indicated he was seeking to introduce the statement because "[i]t goes for lawful authority to leave. The employee is going to tell him that he would like the defendant removed. And therefore, the basis of—is that he (indiscernible) by lawful authority to remove the defendant."[8] He further stated that "[i]t also explains why Sergeant Coleman took the action he did afterwards." Mr. Hinton contends that the statement was introduced for the truth of the matter because it provided "the only basis to support an essential element of the offense." At trial, defense counsel similarly argued that the statement was "absolutely going for the truth of the matter . . . because the truth being it's an element of the case. They have to prove that a person that had authority gave it to [Sergeant] Coleman."

---

[8] We read the "he" in the second sentence to refer not to Mr. Mohammad but rather to Sergeant Coleman given that it was Sergeant Coleman who attempted to remove Mr. Hinton. But in light of the trial transcript's ambiguities—particularly the indiscernible verb—we also address the possibility that the "he" referred to Mr. Mohammad.

We agree with the government that Mr. Mohammad's statement was not introduced to prove its truth. For one, his statement was not offered to show that (1) Mr. Hinton was "bothering [the store clerks] so much," or (2) Mr. Mohammad had given Mr. Hinton "two barring notices." There were no verifiable barring notices issued against Mr. Hinton, and the government did not have to prove that Mr. Hinton was "bothering" anyone to meet its burden (and it did not purport to offer the statement to prove that). So too, Mr. Mohammad did not state something akin to, "I have lawful authority over the store." Nor, as far as we can tell from the trial transcript, did the government offer the statement to prove that Mr. Mohammad in fact had lawful authority over the store. In our view, and as noted *supra* in note 8, the prosecutor was offering the statement to show the lawful authority of *Sergeant Coleman*, not Mr. Mohammad. That is, the statement explained the transference of authority from Mr. Mohammad to Sergeant Coleman in line with our precedent establishing that individuals with lawful authority over private property can exercise their right to exclude via a police-officer agent. *See Darab*, 623 A.2d at 135. It follows, then, that "the mere making of the statement [was] the relevant fact" here, and that therefore "hearsay is not involved." 6 Michael H. Graham, *Handbook of Federal Evidence* § 801:5 (10th ed.); *see also id.* ("[T]estimony by an agent as to a statement by the principal granting him authority to act as agent is not hearsay."); Fed. R. Evid. 801(c) advisory committee's note to 1972 proposed rules (not hearsay

where the making of the statement is what is probative).

In addition to offering the statement to show that Sergeant Coleman had been asked to remove Mr. Hinton from the store, the government also offered it to show its effect on Sergeant Coleman—specifically, the request for assistance explained why Sergeant Coleman tried to convince Mr. Hinton to leave the store, eventually arresting him. *See* Graham, *supra*, § 801:5 (explaining that a statement used to show its effect on a listener, such as an "[i]nstruction[] to an individual to do something," is not hearsay); *In re Dixon*, 853 A.2d 708, 712 (D.C. 2004) ("[T]his court has routinely recognized out-of-court statements as non-hearsay when they are used to show the effect on the listener and not to prove their truth."). We are further assuaged by the trial court's insistence that Sergeant Coleman limit his testimony to how the statement affected him, *see supra* note 7, which in any event suggests to us that the trial court was aware that the statement could not be used to prove any facts it contained, and was admissible only for the limited purposes delineated by the government.

For those reasons, Mr. Hinton's analogy to *Kozlovska v. United States*—an unlawful-entry case where we deemed inadmissible hearsay a "statement by . . . maintenance workers that they had not given [the] appellant permission to enter the apartment"—fails. 30 A.3d 799, 802 (D.C. 2011). There, we determined that the

government was impermissibly seeking to use the statement to prove its truth—that is, to substantively demonstrate that the appellant in that case was without authority to be on the relevant property because she had been previously barred and had not been re-authorized to enter the property. *Id.* The relevance of the assertion in proving a lack of authority hinged on its truth—that the workers had, indeed, "not given . . . permission." *Id.* Here, by contrast, the government did not seek to use Mr. Mohammad's statement about Mr. Hinton having two barring notices to show that Mr. Hinton had been barred from Z-Mart. As noted above, whether Mr. Hinton had been bothering people or had been barred from the store was not why the statement was introduced.[9]

---

[9] Mr. Hinton also points out that as part of its hearsay inquiry, the trial court incorrectly focused on whether the government had disclosed Mr. Mohammad's name to defense counsel prior to trial. That focus was understandable, prompted by defense counsel's statement that his "client ha[d] not had a chance to confront" Mr. Mohammad. Regardless, because our review is de novo, "any potential misstep about the applicable" law at the trial court level "does not affect our analysis." *Fells v. Serv. Emps. Int'l Union*, 281 A.3d 572, 585 (D.C. 2022); *see also Ibn-Tamas v. United States*, 407 A.2d 626, 635-36 (D.C. 1979) ("[I]n reviewing the decision of a lower court, it must be affirmed if the result is correct although the [trial] court relied upon a wrong ground or gave a wrong reason." (internal quotation marks omitted) (quoting *Helvering v. Gowran*, 302 U.S. 238, 245 (1937))); *Craig v. United States*, 551 A.2d 440, 441 n.4 (D.C. 1988) ("We may affirm the trial court on grounds other than those on which it relied."). And as mentioned above, *see supra* note 7, other aspects of the trial court's analysis were more on the mark, such as when the trial court told Sergeant Coleman to limit his testimony to how Mr. Mohammad's statement affected him.

Mr. Hinton's argument that the statement must be hearsay because it was relevant only if it was true—given that it was used to show that Mr. Mohammad "wanted Mr. Hinton to leave"—does not persuade us otherwise. Though we understand the government to have been offering the statement as support for Sergeant Coleman's authority rather than Mr. Mohammad's, given the transcript's ambiguities (*see* supra note 8), we address the alternative scenario. As an initial matter, whether Mr. Mohammad actually wanted Mr. Hinton to leave is not relevant to the elements of the offense; what matters is that he in fact asked Sergeant Coleman to remove Mr. Hinton. Secondly, the primary relevance of the statement, and the limited purpose for which the trial court admitted the statement, was simply to explain the steps the police took. For that purpose, the statement was unquestionably nonhearsay, offered simply to show its effect on the listener—Sergeant Coleman.

Even if we take Mr. Hinton to be contending that the government argued in the trial court that the statement might *also* be relevant, *if true*, for its tendency to show that *Mr. Mohammad* (not Sergeant Coleman) had the requisite legal authority to exclude, we are unpersuaded. That is, had the court not restricted the purpose for which the statement could be considered and somehow regarded Mr. Mohammad's statement as proof that Mr. Mohammad had legal authority to exclude Mr. Hinton, the statement still would not have been inadmissible hearsay. In the hearsay context, "truth of the matter" does not mean that the statement was uttered, but rather that its

intended factual assertions were true.[10] We reiterate that to constitute impermissible hearsay, the statement must have been offered to prove those intended assertions. But here, the only assertion intended by Mr. Mohammad was that Mr. Hinton had two barring notices and that Mr. Hinton was repeatedly bothering him. Yet the government has not claimed that Mr. Hinton actually did have barring notices, and in fact has expressly acknowledged that the notices' validity was uncertain. As discussed above, "[i]f the significance of an offered statement lies solely in the fact that it was made, no issue is raised as to the truth of anything asserted, and the statement is not hearsay." Fed. R. Evid. 801(c) advisory committee's note to 1972 proposed rules; *see also* 2 Kenneth S. Broun et al., *McCormick on Evidence* § 249 (9th ed. & 2025 Supp.) ("If the statement is not . . . offered to prove the facts asserted, it is not hearsay.").[11]

---

[10] Although our references to "intended assertions" are technically redundant because an assertion is by definition an intended assertion, *see Martin v. United States*, 991 A.2d 791, 797 (D.C. 2010), we tolerate the redundancy for the sake of clarity given the extent to which the legal definition of "assertion" in case law and rules of evidence might differ somewhat from common understanding.

[11] Mr. Hinton's reliance on *United States v. Evans*, 216 F.3d 80, 87 (D.C. Cir. 2000), for the proposition that a statement can be used for nonhearsay purposes only where the evidence is on an uncontroverted, nonprejudicial matter also does not convince us otherwise. As the quote Mr. Hinton includes from *Evans* demonstrates, those limits are imposed by the D.C. Circuit as to *hearsay* (not *non*hearsay) evidence admitted for "background" purposes. *Id.* at 87 (explaining that "[s]ometimes courts excuse the use of *hearsay* evidence for background purposes" (emphasis added)). Because the evidence was not hearsay, *Evans* is inapposite.

At most, in that scenario, the statement might somehow have been relevant as what long ago may have been referred to as an "implied assertion." That is, it might suggest that Mr. Mohammad *believed* Mr. Hinton had two barring notices and that he (Mr. Mohammad) needed help excluding Mr. Hinton, from which the factfinder might conclude that Mr. Mohammad *believed* he had a right to exclude Mr. Hinton and that this belief was accurate—meaning that Mr. Mohammad did have a right to exclude. That inference seems unrealistic. The government did not ultimately present the statement for this purpose, and we are not persuaded that a factfinder would draw such an inference on his own. But even if the judge did somehow draw such an inference, that would not convert the statement into hearsay. Such unintended implications[12] were considered hearsay long ago at common law. *See* 30B *Wright & Miller's Federal Practice & Procedure* § 6724 (2025 ed.) (citing *Wright v. Tatham*, 7 Adolph. & E. 313, 386 (Exch. Ch. 1837), where "letters were offered as evidence of the letter writers' belief in the testator's sound mental capacity" instead of for the facts therein but were nonetheless deemed hearsay). But they are not hearsay under the federal rules of evidence, *see id.*; Fed. R. Evid. 801(a) advisory committee's note to 1972 proposed rules ("[N]othing is an assertion unless

---

[12] We use this phrasing in place of "unintended implied assertion" or "unintended assertion" because our law is clear that something is an assertion only if it is actually intended to be one. *See supra* note 10.

intended to be one."), or our own hearsay rules, *see Martin*, 991 A.2d at 797 (D.C. 2010) ("In determining what is an assertion, the crucial distinction . . . is between intentional and unintentional messages, regardless of whether they are express or implied." (citation omitted)).[13]

Accordingly, the statement at issue was nonhearsay and was properly admitted into evidence at trial.[14]

## B. Sufficiency

Mr. Hinton next argues that even if Mr. Mohammad's statement were properly admitted, the government nonetheless failed to introduce sufficient evidence showing that an individual with lawful authority over Z-Mart requested that Mr. Hinton leave the premises. In effect, the contention is that the government did not

---

[13] Of course, intended assertions can be nonexplicit (saying "it's getting late" to a friend to convey "I want to leave now") or explicit but nonverbal (pointing to the robber when asked "who robbed you?"). For instance, in *Grimes v. United States*, we treated the statement, "flip this thing inside out"—spoken by the driver of a car to a police officer asking whether there were guns or drugs in the car—as an intended assertion by the driver that he was innocent of any wrongdoing that was clearly offered by the government to prove the truth of that assertion. 252 A.3d at 916 (citing *Martin*, 991 A.2d at 797).

[14] Mr. Hinton also contends that absent the hearsay statement, the government failed to satisfy its burden of proving that an individual with lawful authority asked Mr. Hinton to leave the store. Because we find that the statement was admissible nonhearsay, we need not reach that issue.

show that Mr. Mohammad had lawful authority over the store.

We review the sufficiency of the evidence de novo. *Odumn v. United States*, 227 A.3d 1099, 1102 (D.C. 2020). Where the trial was a bench trial, like here, "we accept the trial court's factual findings unless they are 'plainly wrong or without evidence to support them.'" *Id.* (quoting *Rahman v. United States*, 208 A.3d 734, 738 (D.C. 2019)). We must find that the evidence is sufficient if we "view[] the evidence in the light most favorable to the government" and determine that "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (emphasis in original) (quoting *Rahman*, 208 A.3d at 738-39). While our review "is not toothless," *Evans v. United States*, 122 A.3d 876, 887 (D.C. 2015) (quoting *Rivas v. United States*, 783 A.2d 125, 136 (D.C. 2001) (en banc)), it is only where the factfinder had to "cross the bounds of permissible inference and enter the forbidden territory of conjecture and speculation" that the evidence is insufficient, *In re T.B.*, 331 A.3d 242, 248 (D.C. 2025) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)). We do not discriminate as between circumstantial and direct evidence. *Brooks v. United States*, 130 A.3d 952, 955 (D.C. 2016).

Under our unlawful-entry statute, we have made clear that "more than one person can have the authority to order someone to leave . . . private premises" and

that we use "reasonableness" as "a factor in determining such authority." *Woll v. United States*, 570 A.2d 819, 822 (D.C. 1990); *see also* Criminal Jury Instructions for the District of Columbia, No. 5.401(B) (5th ed. 2025) (stating that a "person may be [the lawful occupant] [lawfully in charge] of the property even though there are other persons who could, if they chose to do so, cancel or override his/her authority" and that there "may be more than one person who has the authority to order a person to leave the property" (brackets in original)). We have explained, for example, that "someone lacking a possessory interest in the property"—a receptionist, perhaps— could have the requisite statutory authority. *Woll*, 570 A.2d at 822. And we have stressed that "there is no need to scrutinize precisely the limits" of the individual's authority. *Darab*, 623 A.2d at 135. We have also consistently held that an individual with such authority "may act through an agent in ordering someone to leave" and that the agent can be a police officer. *Id.* at 135 n.22; *see also Grogan v. United States*, 435 A.2d 1069, 1071 (D.C. 1981); *Woll*, 579 A.2d at 822 n.6.

The government directs us to a host of evidence supporting its position that a factfinder could have found that it established beyond a reasonable doubt that Mr. Mohammad had lawful authority over the store. First, Sergeant Coleman identified the man in his BWC footage who uttered the nonhearsay statement discussed above as Mr. Mohammad, a "store employee." Sergeant Coleman knew this because he had been to Z-Mart "multiple times" and had met Mr. Mohammad "multiple times."

Second, a portion of Sergeant Coleman's BWC footage played in court shows Mr. Mohammad emerging from and locking the door to a portion of the store that Sergeant Coleman identified as the "sales booth," separated from the rest of the store by glass walls and including various merchandise and a cash register. A reasonable factfinder could infer that Mr. Mohammad had lawful control over the store because only an employee would be able to access that sales booth, which appears restricted to the public in the BWC footage.

Even where a trial court "ha[s] to make a number of inferences to reach [its] conclusion," its finding is permissible because "it is well-established that the finder-of-fact 'is permitted to infer from one fact the existence of another essential to guilt, if reason and experience support the inference' and that 'proof of the first fact can furnish a basis for inference of the second.'" *In re. T.B.*, 331 A.3d at 248-49 (brackets omitted) (quoting *Tot v. United States*, 319 U.S. 463, 467 (1943)). Of course, the government bears the burden of "prov[ing] each and every element of the crime beyond a reasonable doubt"—but that burden "does not operate upon each of the many subsidiary facts on which the prosecution may collectively rely to persuade the [finder of fact] that a particular element has been established beyond a reasonable doubt." *Id.* (second alteration in original) (first quoting *Geddie v. United States*, 284 A.2d 668, 669 (D.C. 1971); and then quoting *United States v. Viafara-Rodriguez*, 729 F.2d 912, 913 (2d Cir. 1984)).

The evidence outlined above, combined with Mr. Mohammad's nonhearsay statement,[15] is enough for a reasonable factfinder to determine that an individual with lawful authority requested—through Sergeant Coleman—that Mr. Hinton leave Z-Mart. *Cf. Woll*, 570 A.2d at 821 (discussing *Feldt v. Marriott Corp.*, 322 A.2d 913 (D.C. 1974), and stating that although the *Feldt* court did not "expressly discuss[]" a restaurant manager's authority to request that a customer leave, it was "clear" there was no "doubt about that authority"); *cf. also id.* at 822 (explaining that in *Grogan v. United States*, 435 A.2d 1069 (D.C. 1981), we held that a clinic receptionist had lawful authority, despite the absence of the owner); *Safeway Stores, Inc. v. Kelly*, 448 A.2d 856, 858, 863 (D.C. 1982) (as to a probable cause determination in a civil false-arrest case, court taking for granted that a supermarket assistant manager had lawful authority to remove an individual from a store).

We therefore conclude that the government presented sufficient evidence as to the lawful-authority element.

### III. Refusal to Leave

Finally, Mr. Hinton argues that the evidence is insufficient to prove that Mr. Hinton actually refused to leave Z-Mart, as the statute requires. Specifically, he

---

[15] *See supra* Part II.A.

contends that because he was arrested approximately ninety seconds after first being asked to leave Z-Mart and because Sergeant Coleman "thwarted" his attempt to exit the store, the government cannot meet its burden as to that element. Like above, we review the sufficiency of the evidence de novo, we look at the evidence in the light most favorable to the government, and we do not discriminate as between direct and circumstantial evidence. *Odumn*, 227 A.3d at 1102; *Brooks*, 130 A.3d at 955.

## A. Ninety Seconds

We have never stated that an individual must be given a certain amount of time to exit the premises. We have indicated, however, that a conviction predicated on a failure to depart instantaneously upon a request to leave would likely be invalid. *Rahman*, 208 A.3d at 741; *see also* 75 Am. Jur. 2d *Trespass* § 166 (2025) ("If a person is not given a reasonable period of time to comply with a request to leave, then there is no trespass."); *accord Curtis v. State*, 58 N.E.3d 992, 994 (Ind. Ct. App. 2016) (same); *Reid v. State*, 481 S.E.2d 259, 260 (Ga. Ct. App. 1997) (what a "reasonable time" means is context dependent and "is a question for the factfinder"); *State v. Gibson*, 95 A.3d 110, 116 (N.J. 2014) ("[T]he duration of the incursion . . . is a factor."); *State v. Dargon*, 398 A.2d 891, 893 (N.J. Super. Ct. App. Div. 1978) ("deliberate and persistent refusal" to quit was enough to convict).

Here, the BWC footage shows that Mr. Hinton was repeatedly told that he had to choose between leaving the store and going to jail. It also shows that ninety seconds was adequate to leave the store because the interaction occurred near the door and so Mr. Hinton had enough time to exit. We therefore cannot say that no reasonable factfinder could have found that Mr. Hinton refused to leave Z-Mart prior to his arrest.[16]

## B. Thwarting

Mr. Hinton also argues that, but for Sergeant Coleman reengaging him, he would have left Z-Mart, and he was therefore thwarted from exiting. Viewed in the light most favorable to the government, however, we cannot say that the evidence was insufficient to show he refused to leave the store. *Cf. Glosser*, 318 A.3d at 515-18 (affirming failure-to-quit conviction where the appellant "testified that she tried to leave the area multiple times but the police would not allow her to do so" because the evidence showed she was "repeatedly told to leave and refused to do so"

---

[16] Mr. Hinton's reliance on *Jideani v. Georgetown University Hospital*, No. 2019 CA 241 B, 2020 D.C. Super. LEXIS 156 (D.C. Super. Ct. Apr. 1, 2020), does not persuade us otherwise. That unpublished Superior Court case is both nonbinding and distinguishable: There, the trial court concluded that the individual's refusal to leave was a materially disputed fact because there was evidence that she had already exited the building. *Id.* at *2, *5, *8. Here, it is uncontroverted that Mr. Hinton was still inside Z-Mart at the time of his arrest.

and "d[id] not show any reasonable attempt" by her "to leave the immediate area").

We first note that the BWC footage does not show Sergeant Coleman or Officer Thomas physically obstructing Mr. Hinton from leaving. *See Reid*, 481 S.E.2d at 260 (evidence sufficient for refusal where there was no evidence that the security guard blocked the appellant's exit). Certainly, that footage does show that after being repeatedly instructed to leave, Mr. Hinton walked toward the store exit. But the footage also shows that Mr. Hinton stopped of his own accord before reaching the exit, keeping his body turned toward Sergeant Coleman (that is, away from the door) when he halted. Though Sergeant Coleman then reinitiated conversation with Mr. Hinton—admittedly reengaging him—we are not convinced that the *only* possible interpretation of the footage is that Sergeant Coleman stopped Mr. Hinton from leaving the store. That is especially true given that (1) Mr. Hinton stopped walking toward the exit of his own volition, and (2) Sergeant Coleman's reengagement was still focused on persuading Mr. Hinton to leave the store by asking him, "What do you plan on doing?" and telling him, "You're gonna leave either way," rather than prompting him to remain in Z-Mart. A reasonable factfinder could have found that Mr. Hinton still had the opportunity to exit the store prior to his arrest, and that the officers did not thwart any attempt of his to do so.

We therefore decline to hold that the evidence was insufficient on the refusal element.

## IV. Conclusion

For the foregoing reasons, we affirm Mr. Hinton's conviction.

*So ordered.*