06-0594-cr
U.S.A. v. Walker

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term, 2007

(Argued: January 17, 2008                                    Decided: June 19, 2008)

Docket No.  06-0594-cr

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA,

*Appellee*,

v.

KENNON AUNRI JOHNSON,

*Defendant*,

ERNEST J. WALKER,

*Defendant-Appellant*.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Before: JACOBS, *Chief Judge*, LEVAL and CABRANES, *Circuit Judges*.

Defendant appeals from conviction following a jury trial in the United States District Court for the District of Vermont (Sessions, *C.J.*) for conspiring to distribute 50 or more grams of cocaine base.  The defendant contends that numerous instances of improper incriminating testimony elicited by the Assistant United States Attorney from a government agent, but not objected to, amounted to plain error.  Because the evidence was overwhelming and the testimony, although clearly improper, had no effect on the jury verdict, we affirm the conviction.

1

GREGORY L. WAPLES, Assistant United States Attorney for the District of Vermont (Thomas D. Anderson, United States Attorney, Paul J. Van De Graaf, Chief, Criminal Division, on the brief), for *Appellees*.

JEREMY G. EPSTEIN, Shearman & Sterling LLP, New York, New York (Paula M. Howell, James L. Athas, of counsel, on the brief), for *Appellant*.

LEVAL, *Circuit Judge*:

Defendant-Appellant Ernest J. Walker appeals from conviction following a jury trial in the United States District Court for the District of Vermont (Sessions, *C.J.*) for conspiring to distribute 50 or more grams of cocaine base in violation of 21 U.S.C. §§ 841(b)(1)(a) and 846. Walker contends that his conviction is tainted by numerous instances in which the Assistant United States Attorney[1] (AUSA) elicited improper, prejudicial testimony by a Special Agent of the Drug Enforcement Administration (DEA). Although we agree with Walker that receipt of the agent's testimony involved substantial and egregious evidentiary errors, we must review for plain error because there was no objection to the improper testimony. Under the plain error standard, we cannot say there was a miscarriage of justice, because the evidence of guilt was overwhelming, and the improper testimony, in our view, had no effect on the jury's verdict. With strong disapproval of the government's tactic and some misgivings, we therefore affirm the conviction.

## BACKGROUND

A. Summary of the Proper Evidence Adduced at Walker's Trial

On April 2, 2002, Samuel Bolden, and Richard Harrelson were arrested in Albany, New

---

[1] None of the Assistant United States Attorneys who presented the case to the court of appeals is the Assistant who prosecuted it in the district court.

York. An ounce of crack cocaine and a gun were found in their car. Bolden agreed to cooperate with law enforcement. Under the supervision of law enforcement agents, he then made a series of phone calls to the defendant Walker concealing the fact of his arrest, one of which was played for the jury. In these calls, Walker agreed to come to Vermont to meet with Bolden.

Walker drove to Vermont on April 5, 2002. He met with Bolden in Walker's car. Their conversation was recorded by a device the agents had hidden on Bolden's body. Using code, which Bolden interpreted for the jury, they discussed Bolden's payment to Walker for the previous supply of drugs (which unbeknownst to Walker had been seized by law enforcement) and arrangements for Walker to resupply drugs to Bolden, which would require that Bolden travel to New York City. Representing it as proceeds of the sale of the earlier consignment, Bolden gave Walker $2100 (in fact supplied by government agents) in payment for the previous supply of drugs. At the conclusion of the meeting, as Walker began to drive away, law enforcement agents stopped his vehicle and arrested him. The $2100 was found on his person.

The proper evidence against Walker included the following:

1. Recorded conversations

The jury heard the tapes of two of Bolden's conversations with Walker. In the April 3 telephone conversation, they discussed the drugs Bolden had previously received from Walker and arrangements for Walker to deliver additional drugs to Bolden, which would be paid for with the proceeds from the sale of the first lot. Bolden told Walker there would be "Two gs, two hundred," or $2200.

The second tape was of conversation between Walker and Bolden in Walker's car in Vermont on April 5, 2002. Walker spoke of an earlier drug transaction; Bolden gave Walker $2100

3

in payment for the previous drugs; and they discussed how to get additional drugs to Bolden. One option was for Bolden to get a ride to Albany, where he could take public transportation to New York City. To this end, Bolden called a friend, "Kenny" (who was, in fact, DEA Special Agent Thomas Doud), and asked whether Kenny might drive him to Albany in exchange for drugs. Kenny declined. Walker and Bolden then discussed driving together to New York to "re-up" with approximately three to four thousand dollars worth of crack.

2. Walker's oral confession

Upon Walker's arrest, after receiving a Miranda warning and waiving his rights, Walker made a detailed confession. He confirmed what Bolden had reported, with added details. Walker explained that he had first started selling drugs in Vermont in February 2002 with a drug dealer named Sam Collins. As part of their arrangement, Walker would bring one to eight ounces of crack to Vermont approximately every other week. Eventually, Walker and Collins fell out. Shortly thereafter, Collins was arrested. After Collins's arrest in March 2002, Walker began to work with Bolden, who was a confederate of Collins. Walker and Bolden had pooled their resources and purchased drugs in New York City for Bolden to distribute in Vermont. (These were the drugs later found on Bolden when he was arrested in Albany.) Walker reported that, despite Bolden's urging, he did not want to come up to Vermont, but eventually agreed to do so to collect the money that Bolden owed to him for the previous supply.

3. Walker's written confession

On April 8, 2002, three days after his arrest, Walker signed a recorded confession. After stating that he waived his rights and wished to cooperate and that the statement was given "freely and voluntarily," he stated: "I started coming to Vermont in February 9th or 10th of 2002. I was

4

coming to Vermont to conduct narcotics business. I was told a lot of money could be made here."

4. Testimony of participants in Walker's conspiracy

Four participants in Walker's conspiracy, Fitzroy Watson, Susanne Cary, Richard Harrelson, and Sam Bolden testified against him.

Fitzroy Watson testified that, starting around March 2002, he had received drugs from Walker seven or eight times. He received about seven grams each time and would sell some of the drugs himself. Susanne Cary testified that she purchased drugs from Watson and that on two occasions she saw Walker with Watson packaging drugs. Richard Harrelson testified that he purchased at least a gram of crack from Walker, and that, after Collins's arrest, Walker had come to Harrelson's house to pick up firearms, which Collins had left there. Walker paid for the firearms with $300 in cash and two grams of crack. Harrelson was later arrested with Bolden in Albany bringing drugs to Vermont.

Sam Bolden testified at length. He recounted that he met Walker through Collins. Bolden testified that he worked with Collins in Vermont. After he had sold about an ounce of crack, Walker had supplied him with another "like a half ounce or so." After Collins's arrest, Bolden testified that, on his way back to Vermont to sell an ounce of crack he had obtained from Walker, he was arrested. Bolden confirmed that he had agreed to cooperate with law enforcement agents and arranged for Walker to come to Vermont to receive his share of the proceeds of the sale of the drugs Bolden had attempted to bring to Vermont. Bolden confirmed the accuracy of the tapes and the transcripts of his phone call with Walker and then the final meeting in Walker's car. As for the phone call on April 3, Bolden explained that he reported to Walker that he had sold the drugs and Walker agreed to use the proceeds to purchase more crack. As for the meeting with Walker on April 5, Bolden

5

explained that part of the conversation involved trying to arrange for Bolden to go to New York City to get a new supply of drugs; this part of the conversation involved the call to Agent Doud, impersonating Kenny.

### 5. Testimony of Government Agents

Special Agent Doud of the DEA provided extensive testimony, part of which is the subject of this appeal. Much of his testimony was not problematic. Doud narrated setting up Bolden's meeting with Walker, what he observed of the meeting, and what he said when he (unexpectedly) received Bolden's call and then impersonated Kenny. (Doud's portion of the telephone conversation was not audible on the recording.) Doud also testified to finding $2100 on Walker's person when he was arrested, and recounted Walker's lengthy oral confession. Doud authenticated the tape and transcript of the April 5 meeting. He also explained the relationship between ounces and grams (one ounce equals approximately 28 grams), illuminating the significance of Walker's confession to transportation of at least two ounces of crack to Vermont in relation to the charge that he conspired to distribute "fifty (50) grams or more." *See* 21 U.S.C. § 841(b)(1)(A)(iii).

Finally, the government called a government chemist who testified to the weight and chemical analysis of the drugs recovered from Bolden.

### B. Walker's Defense

The defense called no witnesses. Through cross-examination and summation, the defense sought to advance the argument that the cooperating witnesses had fabricated or exaggerated Walker's role in an effort to diminish the role of their friend Collins, and to earn consideration for themselves for their assistance in the prosecution of Walker.

**DISCUSSION**

### A. Impermissible Testimony of Agent Doud

6

Walker asserts on appeal that the testimony of Agent Doud was replete with impermissible matter, including prejudicial hearsay directly inculpating Walker in the crime charged (as well as implying that he was guilty of other crimes), impermissible expressions of Doud's own belief that Walker was guilty, improper vouching for government witnesses and analysis of the defendant's character, delivery of summation arguments in the guise of evidence, and general invasion of the province of the jury. We agree that Doud's examination was improperly conducted and included large amounts of impermissible matter.

The instances of improper testimony were numerous. We set forth below some representative examples:

(i)     Asked by the Assistant United States Attorney (AUSA) about the early phases of the investigation leading up to the arrest of Collins, Doud answered:

> A     [W]e found that [Collins] was acting in conjunction with a person who we now know as the defendant Ernest Walker, in having come into Vermont and established themselves as the leaders of the pack . . . And by early to mid-February, we had identified basically three principal higher-level players, Mr. Walker, Mr. Collins, and a man we now know as Mr. Morales.

(ii)    In response to a question by the AUSA how a meeting had come about, Doud answered:

> A     Well, after Mr. Bolden had been arrested in Albany, he had told us the circumstances surrounding the drugs with which he was arrested . . . that he had obtained the crack cocaine from an individual nicknamed Q, *who we knew to be Ernest Walker, who we were already investigating, having identified him as the supplier of multi-ounce crack quantities* that were being distributed in Rutland, Vermont. (emphasis added)

(iii)   When Doud testified on the subject of the preparation of his report on the case, Doud was asked by the AUSA, "What is corroboration, sir?" Doud answered, "Corroboration is verification or justification of proving that something that is alleged actually occurred." From there he went on to give examples of corroboration he had received of the defendant's guilt.

With respect to corroboration of incriminating information obtained from the coconspirator Watson, Doud testified:

> A    Many people who were [Watson's] customers who were purchasing crack from him . . . .
>
> Q    What kind of information did [other agents] obtain from [Watson's customers]?
>
> A    They had obtained information from a number of people that Fitzroy Watson was selling crack cocaine on an active basis, usually utilizing motel rooms in the Rutland area, to distribute his crack. Obviously he was receiving his crack from somebody, and information had indicated that at first it was Morales, and that he had a new supplier. Then we arrested [Watson], seized the crack from him, and he confirmed just that, that he used to get his crack from Mr. Morales, and that *he now got it from Mr. Walker*. (emphasis added)

The AUSA then asked him whether Susanne Cary (one of the government's coconspirator witnesses) had "provide[d] information to law enforcement as well," to which he answered in the affirmative, implying that Cary had confirmed Walker's involvement in the drug dealing.

(iv)    Doud went on to describe Bolden's reports about the relationship between Collins and the defendant as follows:

> A    [B]ack when I first met Mr. Bolden, he had told me that Mr. Collins had asked that Sammy Bolden and another man kill Mr. Walker. And in preparation for this trial, when I asked him exactly what that meant, or exactly how that had come to pass, he said, really, what Mr. Collins said is "take care of your business, take care of the business," and he assumed that that could have been taken in the context of knocking off Mr. Walker, but that he really had not clarified what Mr. Collins meant by it.
>
> Q    But he was clear on the drug aspects?
>
> A    He was clear that Mr. Collins wanted him to come to Vermont and sell crack cocaine. Obviously with Mr. Collins locked up, he was going to have to get his crack cocaine from somebody else. *Obviously Mr. Collins and Mr. Walker had begun to make up from their previous dispute*, and that Mr. Collins wanted to have Mr. Bolden sell additional crack in Vermont, put some of the money to his account in jail, and Mr. Bolden was the person in the middle to do that. (emphasis added)

(v)     Subsequently, Doud was asked about a person referred to in the indictment by the nickname "Mississippi." Doud answered: "[W]e had learned from informants in this case that there was a male nicknamed Mississippi," identified by Doud as Fred McGriff, "who was involved with Mr. Collins and Mr. Walker in the distribution of crack cocaine and other criminal endeavors. "

(vi)     Doud also impermissibly announced his assessment of the defendant's character, ("very shrewd, smart, street-smart, calculating . . . ,"), even speculating that if Walker's car had not been blocked by another car when law enforcement approached to arrest Walker, "we would have had a high-speed pursuit going on throughout Rutland trying to stop this car."

(vii)     Doud also vouched for the credibility of the government's witnesses, effectively communicating that he had skeptically and scrupulously checked out all the information furnished by the witnesses before accepting it. For example, with respect to Watson having identified the defendant as his source of drugs, Doud improperly added, "And you know, that – when I am asked as to how I believe, besides what else they just tell me, or on what else do I rely on, it's information from other people, actual physical evidence, and verification through interviewing the people who are involved."

(viii)     About the plan to have Bolden call Walker to get him to come to Vermont, Doud testified that this would corroborate what Bolden had told about Walker's involvement, thus using his testimony as a vehicle to argue to the jury on the reliability of the government's witness:

> Q     And this also, would it not, tend to corroborate for you Mr. Bolden's
> veracity that —
>
> A      Yes, it was to serve that purpose.
>
> Q      — he had told you the truth?

9

A       Yes, because when people tell us things, no matter how much they may seem true or — that they seem consistent with other information that we have, oftentimes a call such as this either proves or refutes what the person is saying.

(ix)    Assuring the jury of the reliability of the government's entire case, Doud testified:

I am a Special Agent of the United States Drug Enforcement Administration. My duties are basically to investigate violations of the federal controlled substance laws. And what that means to investigate them is to basically to try and identify individuals and organization who are involved in the illicit manufacture, importation, exportation and distribution of drugs.
    And once we have identified them, try and use investigative techniques to obtain evidence that would demonstrate their illegal behavior, and then bring that evidence to a court such as this, to hold these people accountable for their illegal actions.

The testimony quoted in the above examples was improper in many respects. For starters, Doud several times asserted his own belief that the defendant was guilty, and even at times made direct assertions about the defendant's drug dealings as if Doud had witnessed them himself. *See, e.g.*, *United States v. Garcia*, 413 F.3d 201, 210-11 (2d Cir. 2005). We have repeatedly made clear that prosecutors may not express their belief in the defendant's guilt when summing up to the jury. *United States v. Grunberger*, 431 F.2d 1062, 1068 (2d Cir. 1970) (collecting cases); *see also United States v. Modica*, 663 F.2d 1173, 1179 (2d Cir. 1981) (collecting cases). It is equally impermissible for the investigating agent to testify to his belief that the defendant is guilty, and all the more so if he adds, as Doud did, the imprecise assurance that his belief is based on "information from other people, actual physical evidence, and verification through interviewing the people who are involved." *Cf. Garcia*, 413 F.3d at 211 (finding "error to allow law enforcement witnesses to express opinions as to the defendant's culpability based on the totality of information gathered in the course of their investigations."). We have similarly expressed concerns about case agents offering "sweeping conclusions about [the defendant's] activities." *United States v. Dukagjini*, 326 F.3d 45, 54 (2d Cir. 2003) (citation omitted).

10

It is also impermissible for a government agent to vouch for a government witness, *see United States v. Carr,* 424 F.3d 213, 227 (2d Cir. 2005); *United States v. Forrester*, 60 F.3d 52, 63 (2d Cir. 1995), or generally to opine on the credibility of witnesses. *See United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988). Furthermore, in telling the jury that information obtained in the investigation corroborated the statements of witnesses who had accused the defendant, Doud's testimony obscured the important distinction between argument and evidence.

Doud's testimony also was replete with hearsay, repeating to the jury the statements of others describing the defendant's criminal acts. We have often warned about the particular dangers of hearsay being put in the mouth of a case agent, *see, e.g.*, *United States v. Grinage*, 390 F.3d 746, 748-51 (2d Cir. 2004), especially when the testimony involves the repetition of the statements of informants or accomplices. *See, e.g.*, *United States v. Ziegler*, 583 F.2d 77, 81 (2d Cir. 1978).

B. Whether Doud's Evidence Could Be Justified as "Background"

Although acknowledging that some of Doud's testimony should not have been offered, the government argues that some was properly admissible, notwithstanding for example the prohibition of the hearsay rule, because it was offered not to prove the truth of the statements reported but to explain the background of the investigation and the state of mind of the investigating agents, to help explain their actions. The government argues that this evidence would "help the jury understand how this case unfolded, with multiple arrests over time and multiple cooperators . . ."

It is undoubtedly true that the repetition of an out-of-court statement is not necessarily barred by the hearsay rule if it is offered to prove relevant facts other than the truth of what was asserted in the statement, and such evidence may well be appropriate under the balancing test of

Rule 403, *unless* "its probative value [in its permitted evidentiary use] is substantially outweighed by the danger of unfair prejudice," Fed. R. Evid. 403, "resulting from the impermissible hearsay use of the declarant's statement." *United States v. Reyes*, 18 F.3d 65, 70, 72 (2d Cir. 1994). This concept is of little value to the government when the evidence sought to be justified in its nonhearsay use is on the unimportant issue of investigative background, and it has considerable capacity in its improper application for substantial prejudice to the defendant on the crucial issue of proof of guilt.

The government's argument seems to assume that showing the pertinent background of the investigation required the inclusion of information possessed by Agent Doud that was prejudicial to Walker. This is incorrect. When there is legitimate value to showing that the investigating agent was acting in response to information he had received, it is often possible to bring his receipt of that information into evidence without including the portions that are prejudicial to the defendant on trial. For example, there would have been no problem if Agent Doud had testified that, upon the arrest of Bolden, "he told us the circumstances surrounding the drugs with which he was arrested," without adding that Bolden"told us . . . he had obtained the crack cocaine from . . . Ernest Walker" – much less adding that "we were already investigating [Walker], having identified him as the supplier of multi-ounce crack quantities."

Where it is possible in such fashion to secure all or most of the proper value of evidence which is admissible for one purpose but not for another by redacting the prejudicial portions, the balancing directed by Rule 403 will weigh the danger of unfair prejudice added by the unnecessary inclusion of the portions that could have been excluded against their marginal value in support of the permitted purpose. *Cf. United States v. Awadallah*, 436 F.3d 125, 132 (2d Cir. 2006) ("Probative value is also informed by the availability of alternative means to present

12

similar evidence. Specifically, the Supreme Court has advised that the 'Rule 403 "probative value" of an item of evidence . . . may be calculated by comparing evidentiary alternatives.'") (quoting *Old Chief v. United States*, 519 U.S. 172, 184 (1997)). Thus the question here was not whether the government could properly show some background to Doud's investigations, but whether it could properly tell the jury the portions of the background which prejudicially incriminated Walker.

We recognize that the government may be tempted to make its presentation to the jury more compelling, dramatic, and seductive by telling the exciting story of the investigation and how it progressed from suspicion to certitude, and how traps were set which resulted in the defendant's capture, red handed. But the issue to be tried is not how the investigation was conducted, but whether the evidence proves the defendant's guilt beyond a reasonable doubt. The agent's state of mind as the investigation progressed is ordinarily of little or no relevance to the question of the defendant guilt.[2] A prosecutor's tactical desire to tell the jury an exciting, captivating story does not justify expanding the scope of admissible evidence to include improper matter, which, although offered as pertinent to the agent's state of mind, may be used by the jury prejudicially as evidence confirming the defendant's guilt. When the evidence is proper with respect to an unimportant issue but improper and prejudicial on a crucially important issue, it is unlikely to pass the balancing test of Rule 403.

We discussed this issue at some length in *Reyes*, 18 F.3d at 70-72, where, as in this case, the evidence sought to be justified as background in a nonhearsay application included hearsay which bore importantly on the guilt of the defendant. We concluded that the illumination of the

---

[2] The agent's state of mind can, of course, become highly relevant if, for example, the defense questions whether the defendant was accused as the result of an ulterior motive.

13

investigating agent's state of mind could not justify the receipt of importantly inculpatory hearsay. *Id.* The same is true in this case.

We agree with the government that such use of hearsay for an unimportant nonhearsay purpose of setting the stage and explaining background can be appropriate, if the hearsay statement does not assert matter of significant importance to the question of the defendant's guilt. But that latitude has no proper application to the egregiously abusive testimony elicited from Agent Doud, which we reviewed above.

C.  The Significance of the Absence of Objection

The government relies heavily on the fact that the defendant made no objection to the abusive testimony offered through Agent Doud.[3] The absence of objection certainly makes it more difficult for the defendant to succeed on appeal. Had the improper testimony been received over the defendant's objection, the question on appeal would be whether the error was harmless. *See* Fed. R. Crim. P. 52(a). Where the defendant did not object, the issue on appeal will be whether there was "plain error" satisfying the standard of Rule 52(b) of the Federal Rules of Criminal Procedure.

The standard for a finding of "plain error" is not easily met.

> [B]efore an appellate court can correct an error not raised at trial, there must be (1) error, (2) that is plain, and (3) that 'affects substantial rights.' . . . If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings.

*Johnson v. United States*, 520 U.S. 461, 466-67 (1997) (internal citations and quotation marks

---

[3] Defense counsel did object to Dowd's recounting his portion of the telephone conversation between Dowd and Walker. In this instance, the Court properly found that portion of the testimony was not hearsay, but was offered to provide "context" for Walker's side of the conversation that was taped and played in court. Defense counsel did not raise any additional objections.

14

omitted). If this were the end of the inquiry, it might be difficult to determine whether the standard was met in this case. However, the Supreme Court has further clarified that plain error is reserved for "those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young*, 470 U.S. 1, 15 (1985) (quoting *United States v. Frady*, 456 U.S. 152, 163 n.14 (1982)), and will not likely be found when the proper evidence of guilt is "overwhelming," *Johnson*, 520 U.S. at 470; s*ee also United States v. Cotton*, 535 U.S. 625, 633 (2002), in which cases "it would be the reversal of a conviction" that would constitute a miscarriage of justice. *Johnson*, 520 U.S. at 470.

Appellate courts should be wary of vacating the result of a trial based on error to which no objection was made because the absence of objection largely deprives the trial court of the opportunity to correct or prevent the occurrence of the error. Accordingly, a defendant ordinarily may not sit back without objection, allowing errors to accumulate, which might have been prevented or cured by a timely objection, and then benefit from the errors on appeal. Absence of objection, furthermore, is sometimes – not always – an indication that the matter raised on appeal was viewed as having had little or no significance at trial. At the same time, however, it is unacceptable for representatives of the government to present their case with abusive disregard for the rules of law, *see, e.g.*, *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (explaining the special role of the prosecutor as "the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done") (citing *Berger v. United States*, 295 U.S. 78, 88 (1935)), especially when eliciting inadmissible testimony without warning forces the defendant into the uncomfortable posture of making repeated objections, which may appear to the jury to represent an effort to hide damaging information. In this case there was little or no warning from the form of the AUSA's questions that Doud's answers would include inadmissible prejudicial matter, much less

15

a formal proffer.[4]

If a prosecutor phrases a question, "Tell the jury what *X* said about the defendant's participation in the distribution of the drugs," the question puts defense counsel on notice that the answer may well involve hearsay. In contrast, the questions put to Doud were usually phrased in a form that gave no warning what the answer might contain. For example, the AUSA asked Doud, "Could you tell the ladies and gentlemen of the jury how [the meeting in Rutland] came about?" In response to such questions, Doud rambled into impermissible matter – in this particular instance stating that Bolden, after his arrest in Albany told that he "had obtained the crack cocaine from an individual nicknamed Q, who we knew to be Ernest Walker, who we were already investigating, having identified him as the suppler of multi-ounce crack quantities that were being distributed in Rutland, Vermont." It can fairly be said that defense counsel was ambushed by such questions and answers, and often did not have a fair opportunity to object until after the jury had heard the damaging matter, when it was already difficult to limit or cure the harm.[5] On the other hand, had defense counsel objected – even after the fact – the trial court might have ordered a halt to the unfair and prejudicial pattern of examination.[6] All these considerations are pertinent to whether "the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *See Johnson,* 520 U.S. at 467.

---

[4] Nor did the AUSA request a limiting instruction or even notify the court that the out-of-court statements were offered only to explain the case agent's state of mind, but not for the truth of the facts asserted in the statements.

[5] In *Reyes,* we recommended where a prosecutor sought "to elicit potentially incendiary evidence as to which there are arguable grounds for exclusion," that the prosecutor "beg[i]n by a proffer, preferably in writing, explaining the issues in full, so that the defendant had the chance to object and the judge to rule before the harm was done." 18 F.3d at 72.

[6] There is, furthermore, no rule which forbids a trial judge, in the absence of objection, from interceding *sua sponte* to cure the error and to prevent further abuse.

We are left with a binary option which offers no satisfactory answer – whether to overturn a conviction where the evidence powerfully demonstrated the defendant's guilt, and the defendant did not take steps to curtail the abusive practice, or to affirm the conviction and thus appear to condone or reward an abusive disregard of the rules by an Assistant United States Attorney and a Special Agent of the United States Drug Enforcement Administration in presenting a criminal prosecution.

In Walker's case, which included two confessions (one signed), two highly incriminating taped conversations, and the testimony of four of Walker's co-conspirators, the evidence was so overwhelming that it left no conceivable doubt of his guilt. In the face of such proof of guilt, we are persuaded that the numerous serious errors in the presentation of Doud's evidence had no effect on the jury's verdict. There was no miscarriage of justice. We therefore conclude that the errors, although egregious and obvious, did not satisfy the exacting standard for reversal of a conviction in the absence of objection. Our ruling should not be construed as giving *carte blanche* to prosecutors to disregard the rules of law. Had there been an objection or even slightly less conclusive proof, we might well have been compelled to vacate the conviction.

## CONCLUSION

The judgment of conviction is affirmed.

17