NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-2031
_____

UNITED STATES OF AMERICA

v.

OSWELL RAY MCGHEE,
a/k/a June,
a/k/a Eliga


Oswell Ray McGhee,
                              Appellant
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 07-cr-00733-001)
District Judge:  Honorable Michael M. Baylson
_____

Submitted Under Third Circuit LAR 34.1(a)
April 16, 2013

Before:  AMBRO, HARDIMAN and COWEN, *Circuit Judges*.

(Filed: April 24, 2013)


_____

OPINION OF THE COURT
_____


HARDIMAN, *Circuit Judge*.

Oswell Ray McGhee appeals his judgment of conviction for possession with intent to distribute cocaine base, cocaine, and marijuana; possession of a firearm in furtherance of a drug trafficking crime; and possession of a firearm by a felon. We will affirm.

I

In July 2007, during the course of an investigation unrelated to this case, Philadelphia police obtained a warrant for the arrest of McGhee and a warrant for the search of a house located at 2525 North Eighth Street in Philadelphia (the Residence). The police arrested McGhee about two blocks away from the Residence. When booked, McGhee stated that he lived at the Residence with his mother. The police executed the search warrant several hours later.

The Residence was a three-bedroom house, with a rear bedroom that was padlocked shut, a middle bedroom, and a front master bedroom. McGhee's mother, his step-father, and his brother were at the house when the police arrived. The police informed the family that they were executing a search warrant for an investigation involving McGhee, and the family purportedly identified the padlocked rear bedroom as McGhee's room. After the conversation, the officers went to the rear bedroom with McGhee's mother. They asked for a key, but were unable to obtain one from any of the family members, so they forced the door open. Once in the room, police found crack cocaine, powder cocaine, marijuana, two loaded firearms, $12,791 in small bills, ziploc bags of various sizes and colors, two boxes of plastic sandwich bags, several scales, and a

2

money counter. The police also found a shoebox of letters that were addressed to Oswell McGhee. Confident that the room belonged to McGhee, the officers did not dust the room or the evidence for fingerprints.

The state charges against McGhee were eventually dismissed, and McGhee was released from custody, although federal charges were subsequently brought against him. An officer attempted to serve McGhee with an arrest warrant in December 2007 at the Residence, but McGhee was no longer there. He was not located until January 2010 when he was arrested by local police in Scranton, Pennsylvania, where he had been passing himself off as "Elija McGhee." When arrested, McGhee claimed that he had not been back to the Residence since the police began looking for him in 2007.

Based on the contraband found at the Residence, McGhee was charged with one count of possession with intent to distribute more than 28 grams of cocaine base in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B); one count of possession with intent to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(C); one count of possession with intent to distribute marijuana in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(D); one count of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1); and one count of possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1).

At trial, defense counsel sought to persuade the jury that the Government had not produced enough evidence to establish that the rear room in which the contraband was

found was McGhee's room. At the time of the search, the police believed that the room belonged to McGhee because they found a box of letters addressed to McGhee there and because of the family members' identification. The Government encountered two obstacles, however, in relaying this information to the jury.

First, in the time between issuance of the warrant and McGhee's arrest, some of the evidence that had been seized by the Philadelphia police, including the box of letters, had been inadvertently destroyed. The District Court permitted Detective Francis Graf, one of the officers who had conducted the search, to testify that he had discovered the box of letters addressed to McGhee. The Court instructed the jury at the end of the trial that they were entitled to infer from the absence of the letters that the letters may not have been incriminating, but that they were not required to make such an inference.

Second, the Government initially planned to call family members to testify at trial that the rear room was McGhee's. On the morning of trial, however, those family members asserted their Fifth Amendment privilege against self-incrimination and refused to testify.

In light of the family members' refusal to testify and in light of the fact that their statements to the police officers upon their initial entry into the house were inadmissible hearsay, the Government carefully instructed Detective Graf not to testify as to any statements made by McGhee's family during the search. Detective Graf followed these instructions, and never stated that the family had told him that the rear bedroom was

4

McGhee's. Instead, Detective Graf testified that three of McGhee's family members were present when he entered the Residence. He had a conversation with those three as to why the police were there before going with the other officers and McGhee's mother to the padlocked rear bedroom. The prosecution emphasized this sequence of events in its opening statement, encouraging the jury to pay close attention to "how the detectives actually got to the defendant's bedroom." App. 231. The prosecution also mentioned the conversation in its closing argument. App. 487 ("The police meet with the family. They explain, they have a conversation. After they do that, the police go upstairs to the rear bedroom, which is padlocked. No one has a key to the padlock."). The prosecutor explained at a post-trial hearing that she had intended for the jury to infer that the police officers went directly to the rear bedroom because they were told by the family members that that room belonged to McGhee. App. 636–37 ("[T]here was a conversation and then they went directly to this room. That is not impermissible hearsay. That's exactly how that evidence gets into testimony. . . . Nothing got spoken. What got told is a—he had a conversation. Well, what did you do after that conversation? I went to this bedroom. The jury is allowed to make an inference from that and they did.").

Before closing arguments, defense counsel expressed concern that emphasizing the aforementioned sequence of events "assumes and concludes a lot of facts that are not in evidence, including the conversations with the family," App. 472, and that "being able to refer to a conversation had with those individuals sort of gets their testimony in, which it

5

didn't come in," App. 475. The Court then discussed with both parties potential curative instructions. It instructed the jury, without objection, that they should not speculate as to the knowledge of McGhee's family members.

During its deliberations, the jury asked the Court whether the officers had asked to be directed to McGhee's bedroom when they arrived at the house. The Court responded:

> [T]here was no testimony about what any family member said during the search, and the reason there was none is because that testimony would be inadmissible. . . . So my recollection is that there was no testimony about what any family member said to the police officers, which doesn't exactly answer your question, but your question implies that if the officers did ask this, that there was some response. And my recollection is that there was no testimony about what any family member said. Furthermore, I also put in my instructions to you that the family members who were present at the house are not available to testify in this trial. Okay. So you have to decide the case based on the instructions I gave you.

App. 577–78. The judge gave both parties an opportunity to voice any objections to that response, but neither party did so.

The jury found McGhee guilty on all counts and McGhee appealed.

## II[1]

McGhee argues that: (1) the District Court erred in admitting evidence of a conversation that his family had with police officers as non-hearsay; (2) there was insufficient evidence to support his conviction; and (3) the felon-in-possession statute is unconstitutional on its face and as applied in this case. We consider each argument in

---

[1] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291.

turn and find all to be without merit.

A

McGhee argues that the admission of testimony about the conversation between his family and the officers, combined with the Government's comments during its opening statement and closing argument, violated both the hearsay rule and the Confrontation Clause of the Constitution. He claims that the instructions given by the Court were insufficient to correct this error. Defense counsel did not, however, clearly raise these objections at trial. Federal Rule of Criminal Procedure 51(b) "requires a timely and specific objection to evidence erroneously admitted." *United States v. Iglesias*, 535 F.3d 150, 158 (3d Cir. 2008) (citing *United States v. Moore*, 375 F.3d 259, 262 (3d Cir. 2004)) (internal alteration omitted). While "[c]ompliance with Rule 51 does not require 'surgical precision,'" *United States v. Rivera*, 365 F.3d 213 (3d Cir. 2004) (en banc) (quoting Moore's Fed. Prac. 3d § 51.03), the purported objection must be sufficient to apprise the District Court of the issue raised. *See Puckett v. United States,* 556 U.S. 129, 135 (2009); *Iglesias*, 535 F.3d at 158 (objection must be specific and reference the correct issue to preserve the issue).

Here, the record demonstrates that defense counsel only vaguely suggested that introducing testimony about the officers' actions after their conversation with McGhee's family could be problematic. She did not object to Detective Graf's testimony on direct examination or when the Government urged the jury to "listen to how the detectives

7

actually got to the defendant's bedroom" during its opening statement. When defense counsel expressed concern that, if the Government referred to the conversation during its closing argument, it would be encouraging the jury to assume facts that were not in evidence, the Court discussed possible curative instructions with the parties. It then gave the agreed-upon instructions without objection from either party. Because defense counsel's statements at trial were insufficient to place the Court on notice as to the claims that McGhee now raises in this appeal, we will review the prosecution's statements and the admission of Detective Graf's testimony for plain error. *See Puckett,* 556 U.S. at 135; *Iglesias*, 535 F.3d at 158.

To establish plain error, McGhee is required to show "not only that the error affected the outcome of the trial, but that the error was clear or obvious under current law." *United States v. Rivas*, 493 F.3d 131, 136 (3d Cir. 2007); *see* Fed. R. Civ. P. 52(b). Even if these requirements are met, we may reverse, in our discretion, only if we find that "the error 'seriously affect[ed] the fairness, integrity, or public reputation of judicial proceedings.'" *Rivas*, 493 F.3d at 136 (quoting *Johnson v. United States*, 520 U.S. 461, 470 (1997)).

Our sister circuits have held that testimony elicited to establish the content of an out-of-court statement can violate the hearsay rule and Confrontation Clause, even when it does not reveal the exact statement that was made. Under this line of cases, an officer cannot, for example, testify about what a conversation with a third party led him to

8

believe. *See, e.g.*, *United States v. Reyes*, 18 F.3d 65, 67, 69 (2d Cir. 1994). Nor can he testify that, immediately after a conversation with a third party, he began investigating the defendant or charged the defendant with the crime—testimony that would strongly suggest that the third party's statements incriminated the defendant. *See, e.g.*, *United States v. Meises*, 645 F.3d 5, 18–19, 22 (1st Cir. 2011); *Ryan v. Miller*, 303 F.3d 231, 241–44, 250–51 (2d Cir. 2002). Here, statements made by the Government during post-trial arguments clearly show that the prosecution intended for the jury to infer that the family had identified the rear room as McGhee's room, but these arguments were made *after* trial, outside the presence of the jury. The actual testimony elicited about the officers' conversation with McGhee's family is more benign than the testimony elicited in other cases addressing this issue. Detective Graf described the sequence of events that occurred when he entered the house. He did not testify as to beliefs that he had formed as a result of that conversation, nor did he state that he had gone directly to the room *because of* the conversation with the family.[2]

---

[2] *Compare* App. 259–60 ("And at that time there was a conversation about why we were there. And from there, I went to the second floor rear bedroom."), *with Ryan*, 303 F.3d at 241–44, 248–51 (in an attempt to bring out the fact that another suspect had confessed and implicated the defendant, officers testified that one of the officers had interviewed the confessing suspect, that something happened during that interview, that the officer interviewing the defendant learned what had been said during the interview and told the defendant about this information, and that the officer then immediately read the defendant his rights); *see also Meises*, 645 F.3d 18–19, 21–22 (agent emphasized that a defendant was not a target of his investigation before an interview with a suspect but was a target of the investigation immediately after that interview); *United States v. Johnston*, 127 F.3d 380, 394–96 (5th Cir. 1997) (finding prosecutorial misconduct when

Even if Officer Graf's testimony, taken in light of the statements made by the Government during its opening statement and closing argument, did raise hearsay concerns, those concerns were mitigated by the District Court. The Court instructed the jury not to speculate as to any knowledge that the family might have had and reemphasized those instructions when the jury asked whether the officers had requested to be directed to McGhee's bedroom.[3] In light of the ambiguity of Officer Graf's statements—and because we assume that juries follow their instructions, *see United States v. Hakim*, 344 F.3d 324, 326 (3d Cir. 2003)—we cannot find that any error here was "clear or obvious." Accordingly, McGhee's first argument fails.

B

McGhee next argues that the evidence presented was insufficient to support the finding that he was in constructive possession of the contraband. "The burden on a

---

prosecution elicited testimony from several officers that, after having conversations with third parties, they began focusing more on certain individuals and activities); *Reyes*, 18 F.3d at 67 (testimony that, as a result of a conversation, the officer concluded that the defendant was involved in a criminal enterprise); *Hutchins v. Wainwright*, 715 F.2d 512, 514–15 (11th Cir. 1983) (officer testified that after a conversation with a confidential informant, the officer obtained a warrant for the defendant's arrest); *Favre v. Henderson*, 464 F.2d 359, 360–62 (5th Cir. 1972) (prosecution elicited testimony that the police were seeking the arrest of defendant on the basis of a conversation with a confidential informant).

[3] In his brief, McGhee correctly notes that the District Court's opinion on McGhee's motion for a new trial suggested that the jury could have appropriately inferred that McGhee's family members told the officers that the padlocked room belonged to McGhee, and that it could have relied on this inference in reaching its verdict. Whether there was plain error in the proceedings below, however, depends on the evidence that

defendant who raises a challenge to the sufficiency of the evidence is extremely high."

*Iglesias*, 535 F.3d at 155 (quoting *United States v. Lore*, 430 F.3d 190, 203-04 (3d Cir. 2005)).  In reviewing this claim, "we must consider the evidence in the light most favorable to the government and affirm the judgment if there is substantial evidence from which any rational trier of fact could find guilt beyond a reasonable doubt."  *Id.* (quoting *Lore,* 430 F.3d at 204).

To establish that McGhee was in constructive possession of the contraband, the Government was required to show that he both knew of the contraband and that he had "dominion and control" over it.  *United States v. Cunningham*, 517 F.3d 175, 178 (3d Cir. 2008) (quoting *United States v. Iafelice*, 978 F.2d 92, 96 (3d Cir. 1992)).  Although dominion and control cannot be established by "mere proximity to the [contraband], or mere presence on the property where it is located," *United States v. Brown*, 3 F.3d 673, 680 (3d Cir. 1993), contraband stored in a room that belonged to McGhee and that was generally inaccessible to others goes well beyond "mere proximity."

The Government submitted sufficient evidence to support the finding that the padlocked room belonged to McGhee.  McGhee admitted to the police after his arrest that he lived at the Residence.  When the police arrived there, they found McGhee's mother, stepfather, and brother at home.  Only one of the three bedrooms in the house was padlocked, and the police were unable to obtain a key from any of the family members.

was presented to the jury and the instructions that were given at the time of trial.

After using force to enter the bedroom, the police found a box of letters that were addressed to Oswell McGhee at that address.  The jurors were informed that they *could* draw an adverse inference with respect to the probative value of the letters because the letters had been destroyed.  Because we take the evidence in the light most favorable to the Government, however, we assume that the jurors did not draw an adverse inference, and instead relied upon the box of letters in reaching their decision.  The jurors were also entitled to consider the fact that McGhee fled to Scranton and assumed an alias after federal authorities attempted to arrest him for possession of the contraband.  *See United States v. Green*, 25 F.3d 206, 210 (3d Cir. 1994); *United States v. Miles*, 468 F.2d 482, 489–90 (3d Cir. 1972).  Thus, based on the evidence presented at trial, a reasonable juror could have found that McGhee was in constructive possession of the drugs and weapons found in the rear padlocked room.

C

Finally, McGhee argues that 18 U.S.C. § 922(g)(1), which prohibits possession of a firearm by a felon, is unconstitutional on its face, as an invalid exercise of Congress's authority under the Constitution's Commerce Clause.  Alternatively, he argues that it is unconstitutional as applied in this case because evidence that the firearms were manufactured outside of Pennsylvania did not establish a sufficient nexus between McGhee's possession of the firearm and interstate commerce.  As McGhee

---

Comments made by the District Court months after the trial do not affect our analysis.

12

acknowledges, these arguments are precluded by our decision in *United States v. Singletary*, 268 F.3d 196, 204–05 (3d Cir. 2001).

## III

For the foregoing reasons, we will affirm McGhee's judgment of conviction.